**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DEWANCHAND RAMSARAN | § | |
| INDUSTRIES (P) LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-1274 |
| | § | |
| | § | |
| PORTS AMERICA TEXAS, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This maritime dispute arises from damage to drilling equipment at the Port of Houston when the equipment rolled off a forklift. The damage occurred after the equipment had been unloaded from a truck and before it was loaded on a vessel for shipment to India. The cargo owner, Dewanchand Ramsaran Industries (P) Ltd., sued the stevedore/terminal operator, Ports America Texas, Inc., which was operating the forklift when the damage occurred. Ports America moved for partial summary judgment that under the Carriage of Goods by Sea Act ("COGSA"), 49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701, and the bill of lading between Dewanchand and Swire Shipping, the ocean carrier, liability is limited to $500.00. (Docket Entry No. 42). Dewanchand has responded, arguing that Ports America is not entitled to partial summary judgment on two grounds: it is not covered by the $500.00 per package limitation because it was not employed by the carrier (or its agent) but instead by the cargo owner's agent; and the damaged equipment was not a "package," leaving a disputed fact issue as to whether damages are calculated on a per package or on a weight/measurement basis. (Docket Entry No. 49). Ports America has

replied.  As to the first point, Ports America argues that although it had unloaded the cargo under an agreement with Pentagon Freight Services, Inc., an agent of the cargo owner, when the cargo was damaged, it was working under a stevedoring agreement with Swire Shipping (the carrier).  As to the second point, Ports America argues that as a matter of law, the drilling equipment was a "package" subject to the COGSA limitation.  (Docket Entry No. 52).

Based on the motion, response, and reply; the record; and the applicable law, this court denies Ports America's motion for partial summary judgment on a narrow basis.  The motion is denied in part because the present record is inadequate for this court to determine whether, as a matter of law, when the drilling equipment tipped off the forklift and rolled, Ports America was working under its agreement with Pentagon Freight Services or under its agreement with Swire Shipping.  This deficiency in the record may well be cured by either supplemental affidavits or a brief bench trial.  The motion is granted in part; the drilling equipment is a "package" for the purpose of the $500.00 "per package" damages limitation.

The reasons for this ruling are explained in detail below.

## I.      The Record

On September 12, 2007, a 45,000-pound piece of drilling equipment, called an "SCR House," fell off a forklift at the Port of Houston.  The SCR House and 44 other components of a disassembled oil rig were delivered to the port in trucks by Pentagon Freight Services, Inc.  It appears from the record that either Dewanchand (the equipment owner), Omron Oilfield & Marine, Inc. (the manufacturer of the equipment),  Expert Crating, Inc. (the company that packaged it for shipping), or Drilling Services International, Inc. (apparently the company that shipped the equipment to Dewanchand) hired Pentagon to deliver the SCR House and the other pieces of the rig

2

by truck to the Port of Houston.  Ports America employees unloaded the equipment from Pentagon's trucks.  This work was done under a contract between Pentagon, an agent of the cargo owner, and Ports America.  The record includes an invoice from Ports America Texas to Pentagon for work performed on September 12, 2007 through September 14, 2007.  (Docket Entry No. 52, Ex. 2).  Ports America explained that the invoice was for unloading the equipment from the trucks.  (Docket Entry No. 52 at 2).

The cargo was to be loaded on the M/V PACIFIC MAKASSAR, a ship owned and operated by Swire Shipping, for transport from Houston to Mumbai, India.   Ports America had a contract with Swire Shipping to perform stevedoring services.  The record includes an invoice from P&O Ports Texas, Inc. to Swire Shipping for loading cargo onto the PACIFIC MAKASSAR between September 8, 2007 and September 14, 2007.  (Docket Entry No. 52 at 3; *Id.*, Ex. 3).  Ports America's work in loading the PACIFIC MAKASSAR was not limited to Dewanchand's drilling equipment but extended to other cargo, including automobiles and bags of rice.  (*Id.*, Ex. 3).

The Booking Note for this shipment states that it is an "agreement between Swire Shipping . . . and Pentagon Freight Systems, Inc., Houston as agent for the owner of the cargo (herein referred to as shipper)."  The Note lists John Energy, Inc. of Houston as the "shipper," Dewanchand as the "consignee," and Ports America as the "stevedores."

The Swire Shipping bill of lading lists Drilling Structures International as the "shipper," Dewanchand as the "consignee," and Pentagon as the "forwarding agent – references."  (Docket Entry No. 42, Ex. 5 at 1).  It provides for shipment of 45 "packages" from Houston to Mumbai.  (*Id.*).  The incorporated terms and conditions were the contract of carriage for the shipment.  The terms and conditions include the following:

## 1.    DEFINITIONS

"Merchant" includes any Person who at any time has been or becomes the Shipper, Holder, Consignee, Receiver of the Goods, any Person who owns or is entitled to the possession of the Goods or of this Bill of Lading and any Person acting on behalf of any such Person.
. . .

"Person" includes an individual, group, company or other entity.

"Sub-Contractor" includes (but is not limited to) owners and operators of vessels (other than the Carrier), *stevedores, terminal and groupage operators*, road, air and rail transport operators and any independent contractor *employed by the Carrier* in performance of the Carriage and sub-sub-contractors thereof.
. . .

"Carriage" means the whole or any part of the operations and services undertaken by the Carrier in respect of the Goods covered by this Bill of Lading.
. . .

## 4.    SUB-CONTRACTING AND INDEMNITY

(1)  The Carrier shall be entitled to Sub-Contract the Carriage on any terms whatsoever.

(2) The Merchant undertakes that no claim or allegation shall be made against *any Person* whomsoever by whom the Carriage is performed or undertaken (*including all Sub-Contractors of the Carrier*), other than the Carrier, which imposes or attempts to impose upon any such Person or any vessel owned by any such Person, any liability whatsoever in connection with the Goods or the Carriage of the Goods, whether or not arising out of negligence on the part of such Person and, if any such claim or allegation should nevertheless be made, the Merchant will indemnify the Carrier against all consequences thereof.  Without prejudice to the foregoing every such Person or vessel shall have the benefit of every right, defence, limitation and liberty of whatsoever nature herein contained or otherwise available to the Carrier as if such provisions were expressly for his benefit, and in entering into this contract, the Carrier, to the extent of these provisions, does so not only on his own behalf but also as agent and trustee for such Persons or vessel.

4

. . .

### 27.    USA CLAUSE PARAMOUNT (If applicable)

(1) If Carriage includes carriage to, from or through a port in the United States of America, this Bill of Lading shall be subject to the United States Carriage of Goods by Sea Act 1936 (US COGSA), the terms of which are incorporated herein and shall be paramount throughout Carriage by sea *and the entire time that the Goods are in the actual custody of the Carrier or his Sub-Contractor at the sea terminal in the United States of America before loading onto the vessel* or after discharge therefrom, as the case may be. . . .

(3) If US COGSA applies the liability of the Carrier and/or the Vessel shall not exceed US$500 per package or customary freight unit (in accordance with Section 1304(5) thereof), unless the value of the Goods has been declared on the face hereof, in which case Clause 7(4) [governing declared value] shall apply.

(*Id.* at 4 (emphasis added)).  Dewanchand did not declare any value of the goods on the Bill of Lading, opting instead to obtain private insurance.

The SCR House had been prepared for shipping before it was delivered to the Port of Houston.  Its apparently permanent state was essentially  a "box."  The SCR House was "covered in pre fabricated metal and painted white."   In preparation for shipping, much of this metal box was covered in plywood, including over the rear half of both sides and "over vents or other openings along the top."   On the underside, there was a "steel skid for mounting and [ ] a foam insulation where it contacted the house filling gaps in the framing.  (Docket Entry No. 52, Ex. 6).

On September 12, 2007, after the SCR House had been unloaded from the Pentagon trucks, it tipped and rolled off "tandem forklifts" being used to move it.  The SCR House "flipped on its side and landed flat."  After the fall, "[t]here were scrapes on the crossmemebers [sic] corresponding to the forklift placement and some insulation was torn away adjacent.  The side panels were scuffed,

and scraped and lower base boards were bent or twisted slightly." (*Id.*).  An investigation by Scott Harcourt of Captain Joe Grace Surveyors, LLC found that the SCR House had fallen "due to the removal of one of the forklifts." (*Id.*).  According to the Captain Joe Grace Surveyors, LLC investigation, the SCR House fell while Ports America was "preparing to load" it onto the ship. (*Id.*, Ex. 6).  According to a Ports America document, however, the accident occurred when the SCR House "was being discharged from an over the road truck by two forklifts to be place[d] in the warehouse until the vessel it was to be loaded on arrived [sic]." (Docket Entry No. 49, Ex. E).  And a Ports America "Event Report" states that the incident occurred "after the cargo was unloaded from the back of a truck." (*Id.*, Ex. F).  A March 20, 2008 letter sent by Juan Martinez from the Recovery Claims Department of WK Webster (Overseas) Ltd. to Swire Shipping, on behalf of the "cargo interests" informed Swire Shipping "that the claim arose whilst the goods were in your care and custody" and that WK Webster held Swire Shipping "fully liable."  (Docket Entry No. 52, Ex. 4). The letter  "enclos[ed] documents in support of" a claim for $498,831.29 relating to the shipment and bill of lading.  (*Id.*).

On April 25, 2008, Dewanchand sued Ports America, alleging negligence and breach of the implied warranty of good and workmanlike performance, seeking a judgment of $500,000. (Docket Entry No. 1). Ports America answered.  (Docket Entry No. 5).  On October 1, 2008, with leave of the court, Ports America filed a third-party complaint asserting claims against Pentagon, Drilling Structures International, Omron, and Expert Crating. (Docket Entry No. 13). Ports America's third-party claim was based on the failure of those companies properly to prepare the SCR House for transport or mark it as top heavy.  Omron answered the third-party complaint, (Docket Entry No. 17), and Dewanchand's complaint, and asserted a breach-of-contract counterclaim against

6

Dewanchand based on an unpaid invoice.  (Docket Entry No. 18).  Dewanchand answered.  (Docket

Entry No. 26).  Pentagon answered the third-party complaint and counterclaimed against Ports

America for indemnity.  (Docket Entry No. 27).  Ports America answered.  (Docket Entry No. 30).

Drilling Structures, (Docket Entry No. 22), and Expert Crating, (Docket Entry No. 31), also

answered the third-party complaint, without asserting counterclaims.

Ports America has moved for partial summary judgment on Dewanchand's claims.  (Docket

Entry No. 42).  Ports America argues that its liability, if any, is limited by section 4(2) of the bill,

the "Himalaya Clause,"[1] to $500.00.  Dewanchand has responded, arguing that Ports America does

not qualify as a "Sub-Contractor of the Carrier" as necessary for the $500.00 limit because Ports

America  was working under a contract with Pentagon, which was Dewanchand's agent, when the

SCR House was damaged.  Dewanchand also argues that the SCR House was not a "package" and

there is a fact issue as to whether the damage should be calculated based on the cargo's customary

freight unit (weight) used for shipping costs.  (Docket Entry No. 49).  Ports America has replied.

(Docket Entry No. 52).

Both  issues are considered below.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine

---

[1]  Clauses in maritime contracts extending liability limitations to additional parties are called Himalaya
Clauses after an English Case, *Adler v. Dickson*, [1955] 1 Q.B. 158 (C.A.), in which the dispute involved the
steamship *Himalaya.  See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 20 n.2, 125 S.Ct. 385 (2004).

7

issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

8

The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Id.* (emphasis in original); *see also Meecorp Capital Markets LLC v. Tex-Wave Industries LP*, 265 Fed. App'x 155, 157 (5th Cir. 2008) (per curiam) (unpublished) (quoting *Fontenot*, 790 F.2d at 1194).

## III.   Analysis

### A.   Whether Ports America Was a "Sub-Contractor of the Carrier"

The first issue raised in Dewanchand's motion for partial summary judgment is whether Ports America is entitled to the liability limit in the bill of lading as a "Sub-Contractor of the Carrier" under sections 1 and 27(1) of the bill of lading or as "any Person whomsoever by whom the carriage is performed or undertaken" under section 4(2).

The parties do not dispute that the bill of lading is properly interpreted under federal law. The relevant terms of the bill of lading incorporate and expand upon COGSA, 49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701.[2]   COGSA governs bills of lading "from the time when the goods are loaded on to the time when they are discharged from the ship." COGSA § 1(e),

---

[2]   COGSA was previously codified in the appendix to Title 46 of the U.S. Code.  When Title 46 was recodified in 2006 by Pub. L. 109-304, Oct. 6, 2006, 120 Stat. 1485, COGSA was not included except as a statutory note to the first section of the Harter Act, 46 U.S.C. § 30701.  *See* David W. Robertson & Michael F. Sturley, *Recent Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits*, 32 Tul. Mar. L.J. 493, 500 (2008) (explaining the codification issues).  COGSA was not repealed by the recodification.  *See, e.g., Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237 (5th Cir. 2009) (applying COGSA).

9

49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701; *Kirby*, 543 U.S. at 29, 125 S. Ct. 385.  During this "tackle to tackle" period, as a default rule, the carrier's liability is limited to $500.00 per package, "or in the case of goods not shipped in packages, per customary freight unit," unless a higher value has been "declared by the shipper before shipment and inserted in the bill of lading," or the carrier and shipper have agreed to a higher limit by contract.  COGSA § 5, 49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701.

Under COGSA, contracting parties may extend the period during which the liability limit applies to include "the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship."  *Id.*, § 7, *reprinted in* note following 46 U.S.C. § 30701 ("Nothing contained in this chapter [this note] shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea." (alterations added by Pub. L. 109-304, Oct. 6, 2006, 120 Stat. 1485)).  Swire Shipping and Dewanchand agreed that COGSA would apply "the entire time that the Goods are in the actual custody of the Carrier or his Sub-Contractor at the sea terminal in the United States of America before loading onto the vessel or after discharge therefrom, as the case may be." (Docket Entry No. 49, Ex. G).  This is known—and referred to in the bill of lading—as a "Clause Paramount."  *See Interflow (Tank Container System) Ltd. v. Burlington Northern Santa Fe Ry. Co.*, No. H-04-cv-2871, 2005 WL 3234360, at *4 (S.D. Tex. Nov. 29, 2005).

Dewanchand argues that Ports America is not a party entitled to take advantage of the otherwise enforceable limitations on liability in the bill of lading.  The Himalaya Clause, section

4(2) of the bill of lading, limits the liability of "any Person whomsoever by whom the Carriage is performed or undertaken (including all Sub-Contractors *of the Carrier*)." (*Id.* (emphasis added)). Contrary to Dewanchand's argument, there is no need to construe this provision narrowly. There is also no requirement of privity between Swire Shipping and Ports America. Instead, because "there is no special rule for Himalaya Clauses," the provision should be interpreted like any other contract term. *Kirby*, 543 U.S. at 31, 125 S. Ct. 385. Because the Himalaya Clause is clear and unambiguous, it is interpreted based on its plain meaning. *See id.* at 31-32 (citing *Green v. Biddle*, 8 Wheat. 1, 89-90, 5. L. Ed. 547 (1823)); *Henley v. Edlemon*, 297 F.3d 427, 430 & n. 5 (5th Cir. 2002) (describing federal law of contract interpretation); *Funeral Financial Sys. v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000) (same). Ports America is within the clause if it is a subcontractor of Swire Shipping or, if it is otherwise a "Person" who "performed" the "Carriage."

"Sub-Contractor" is a defined term in the contract. It "includes (but is not limited to) owners and operators of vessels (other than the Carrier), stevedores, terminal and groupage operators, road, air and rail transport operators and any independent contractor employed by the Carrier in performance of the Carriage and sub-sub-contractors thereof." (Docket Entry No. 49, Ex. G). Ports America argues that "employed by the Carrier" modifies "any independent contractor," which would mean that stevedores and terminal operators are "Sub-Contractors" regardless of whether they were working under a contract with the cargo owner or the carrier (or their agents). Dewanchand argues that all of these entities must be "employed by the Carrier" in order to satisfy the definition of "Sub-Contractor." The Himalaya Clause limits the liability of "Sub-Contractors of the Carrier," not of "Sub-Contractors" generally. The term "Sub-Contractors of the Carrier" means that for Ports America to benefit from the $500.00 limitation, it must have been working as a subcontractor of

Swire Shipping (the carrier), not of Pentagon (the cargo owner's agent) when the SCR House was damaged.

The most natural reading of "Sub-Contractors of the Carrier" is that it covers only subcontractors' work done under the subcontract. The Himalaya Clause states that Swire Shipping is entering into the contract of carriage on its own behalf as well as "agent and trustee" for others by whom the "Carriage is performed or undertaken," which includes "Sub-Contractors of the Carrier." "Person" is defined to include individuals as well as groups, companies, and other entities. "Carriage" is defined as "the whole or any part of the operations and services *undertaken by the Carrier* in respect of the goods covered by this Bill of Lading." (Docket Entry No. 49, Ex. G (emphasis added)). The words "undertaken by the Carrier" limits the Himalaya Clause's reach to liability incurred by subcontractors engaged in activities on behalf of the carrier. The Himalaya Clause only covers the work Ports America was performing as a subcontractor for Swire Shipping.

Ports America also emphasizes that section 4(2) of the bill of lading covers "any person whomsoever by whom the Carriage is performed or undertaken." (*Id.*, Ex. G). Although the words "any" and "whomsoever" have "an expansive meaning," *See Kirby*, 543 U.S. at 31, 125 S. Ct. 385, these broad terms are restricted by the term "Carriage" to work undertaken by Swire Shipping. This reading does not contravene the Supreme Court's warning in *Kirby* that Himalaya Clauses are not subject to any requirement of "linguistic specificity," privity, or narrow construction. *See id.* Instead, it accepts the ordinary meaning of the words in the Himalaya Clause and is consistent with *Kirby*. *See id.* at 31-32. In *Kirby*, the bill of lading subject to textual interpretation was between Kirby, the cargo owner, and ICC, the company that Kirby had hired to arrange for carriage of the goods from Sydney, Australia to Huntsville, Alabama. ICC arranged for Hamburg-Sud to provide

ocean transport; Hamburg-Sud sub-subcontracted with Norfolk to carry the goods by rail from the Port of Savannah, Georgia to Huntsville, Alabama.  The suit arose when the Norfolk train derailed. *Id.* at 19-21.  The Himalaya Clause stated that the $500.00 limit applied "whenever claims relating to the performance of the contract evidenced by this [bill of lading] are made against any servant, agent or other person (including any independent contractor) whose services have been used in order to perform the contract."  *Id.* at 20 (emphasis added by *Kirby* Court).  Because the bill of lading between Kirby and ICC provided for through shipment to Huntsville and not just to the Savannah seaport, Norfolk's *work* was covered.  The issue was whether Norfolk was outside the bill's reach because it was a sub-subcontractor.  The Court found that the clause "indicate[d] an intent to extend the liability limitation broadly" to anyone "whose services contribute[d] to performing the contract," which included sub-subcontractors.  *Id.* at 31.  The Court concluded that the broad language of the Himalaya Clause was consistent with the nature of performance under the contract.  Norfolk could rely on the Himalaya Clause because "a railroad like Norfolk was an intended beneficiary of the . . . broadly written Himalaya Clause."  *Id.* at 31-32.

In the present case, the plain meaning of the Himalaya Clause is that Ports America is an intended beneficiary when it is performing work required of Swire Shipping under its contract with Dewanchand.  By limiting the Himalaya Clause to the "Carriage," and by limiting the definition of "Carriage" to those "operations and services undertaken by" Swire Shipping, the bill of lading shows the parties' intent to extend the Himalaya Clause to work that the carrier subcontracted.

Section 27(1), the Clause Paramount, is consistent.  It makes COGSA applicable "the entire time that the Goods are in the actual custody of the Carrier or his Sub-Contractor at the sea terminal in the United States."  (Docket Entry No. 49, Ex. G).  This provision also requires that the party

13

seeking the liability limit must have custody of the goods as the carrier's subcontractor.  This reading is consistent with the language in COGSA that a Clause Paramount may be added to extend COGSA's coverage to liability relating to "the *custody* and care and handling of the goods." COGSA § 7, 49 Stat. 1207 (1936), *reprinted in* note following 46 U.S.C. § 30701 (emphasis added); *see also Mannesman Demag Corp. v. M/V Concert Express*, 225 F.3d 587 (5th Cir. 2000) ("'A [Clause Paramount] can be used to extend COGSA's application to the entire time the goods are within the carrier's *custody*.'" (quoting Charles S. Donovan & Jill M. Haley, *Who Done It and Who's Gonna Pay?-Rights of Shippers and Consignees Against Non-Ocean Carriers Performing Part of a Contract of Carriage Covered by a Through Bill of Lading*, 7 J. INT'L L. & PRAC. 415-17 (1998) (emphasis added))).

The record shows that Ports America was a subcontractor of both Swire Shipping *and* Pentagon during different phases of the work relating to the cargo.  The two signatories to the Booking Note were Pentagon and Swire Shipping.  Dewanchand contends that Ports America was hired by Pentagon and Ports America contends it was hired by Swire Shipping.  Either Pentagon or Swire Shipping could have supplied Ports America's name in drafting the Booking Note.  Ports America sent an invoice to Pentagon for unloading the drilling equipment off Pentagon's truck. Ports America also sent an invoice to Swire Shipping to load the equipment from the dock onto the ship for carriage to India as part of the stevedoring work for the PACIFIC MAKASSAR's voyage to Mumbai in September 2007.  Ports America loaded not only the drilling equipment delivered by Pentagon on to the ship but also automobiles, bags of rice, and other cargo.

It is unclear from the present record whether, when the SCR House fell from the forklift that Ports America employees were operating, Ports America was performing work under its subcontract

14

with Swire Shipping.  The relevant record evidence is conflicting and unclear.  According to the report prepared by Captain Joe Grace Surveyors, LLC after it investigated the incident, the box fell while Ports America was "preparing to load" it onto the ship.  (*Id.*, Ex. 6).  According to a Ports America document,  the incident occurred when the  SCR House "was being discharged from an over the road truck by two forklifts to be place[d] in the warehouse until the vessel it was to be loaded on arrived [sic]."  (Docket Entry No. 49, Ex. E).  And a Ports America "Event Report" states that the incident occurred "after the cargo was unloaded from the back of a truck" but gives no other information.  (*Id.*, Ex. F).  The WK Webster letter, apparently sent on behalf of Dewanchand or its insurer, informed Swire Shipping "that the claim arose whilst the goods were in your care and custody" and that WK Webster held Swire Shipping "fully liable."  (Docket Entry No. 52, Ex. 4). The present record is inadequate to determine whether, as a matter of law, Ports America was working under its subcontract with Pentagon or its subcontract with Swire Shipping when the SCR House fell off the forklift and was damaged.

When the SCR House fell from the forklift, it was in the actual custody of Ports America. *See T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338 (5th Cir. 1980) (determining, for the purposes of a bill of lading, that bags of flour were not in the "actual custody" of the carrier when they were in a warehouse at the port before being loaded on a ship for transport;  a company the shipper/seller hired to test the flour for infestation accessed, moved, tested, and twice fumigated the flour at the seller's direction and without the carrier's consent).  On the present record, however, it cannot be said as a matter of law that Ports America had custody of the SCR House as part of its work as Pentagon's subcontractor or as Swire Shipping's subcontractor.

Based on the record currently before this court, Ports America's motion for partial summary judgment that it is entitled to the liability limitation in the bill of lading is denied.   It appears, however, that the deficiency in the record may be addressed by either supplemental evidence in the form of affidavits or by a bench trial after brief discovery.

### B.        Whether the SCR House was a Package

COGSA does not define the term "package" and its legislative history does not provide any guidance.  *Crispin Co. v. M/V Morning Park*, 578 F. Supp. 359, 359 (S.D. Tex. 1984).   In considering this issue, the Fifth Circuit has borrowed heavily from Second Circuit law.   The Second Circuit defines "package" broadly as a "class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods."  *Aluminios Pozuelo Ltd. v. S.S. Navigator,* 407 F.2d 152, 155 (2d Cir. 1968); *see also Hayes-Leger Assoc., Inc. v. M/V Oriental Knight*, 765 F.2d 1076, 1080 (11th Cir. 1985) (adopting the Second Circuit's definition).   Although it has not given a general definition of the term "package," the Fifth Circuit has stated that the cargo need not be fully enclosed. *Calmaquip Engineering West Hemisphere Corp. v. West Coast Carriers*, 650 F.2d 633, 639 (5th Cir. 1981) (citing *Stirnimann v. The San Diego*, 148 F.2d 141 (2d Cir. 1945)); *see also Crispin*, 578 F. Supp. at 360 ("While the Fifth Circuit apparently has not conclusively defined 'package' in this context, it has stated clearly that cargo does not have to be fully enclosed to qualify as a package.").

The undisputed facts in the record show that, as a matter of law, the SCR House was a "package" under the applicable cases.  The survey report states that there was plywood covering the rear half of each side of the SCR House as well as vents and other openings on the top.  The bottom

16

was a "steel skid for mounting and had a foam insulation where it contacted the house filling gaps in the framing." (Docket Entry No. 52, Ex. 6). The photographs support this description, revealing that the SCR House was largely covered in plywood and that a frame was built around the bottom. (*Id.*). These additions, particularly the skid, constitute "packaging preparation for transportation" that "facilitates handling." *See Aluminos Pozuelo*, 407 F. 2d at 155. The SCR House also has the "common-sense, visual appearance of a package." *See Crispin*, 578 F. Supp. at 360.

When, as here, COGSA does not apply of its own force (because the damage occurred when the goods were not yet aboard ship), but through incorporation into a bill of lading, the "package" requirement is to be interpreted like any other contractual provision. *Croft & Scully Co. v. M/V Skulptor Vuchetich*, 664 F.2d 1277, 1280-81 (5th Cir. 1982); *see also Craddock Int'l Inc. v. W.K.P. Wilson & Son, Inc.*, 116 F.3d 1095, 1107 (5th Cir. 1997) ("Even if the second quoted paragraph of [a contract provision] construed to 'incorporate' fully certain COGSA concepts, that does not mean that COGSA in its entirety. . . applies through the policy."). The Fifth Circuit again relies on Second Circuit authority. *See Croft & Scully Co.*, 664 F.2d at 1280 (tracing the development of the law in this area); *Allstate Ins. Co. v. Inversiones Navieras Imparca, C.A.*, 646 F.2d 169, 171-73 ("We follow the holding and reasoning in the two decisions by Judge Friendly" of the Second Circuit); *Crispin*, 578 F. Supp. at 360 n. 4 ("The Fifth Circuit in [*Allstate*] expressly adopted the holding and reasoning of two Second Circuit opinions defining 'package' under COGSA, both of which referred to the shipping documents and other evidence of the intention of the parties."). The Second Circuit's approach is to "begin with a bill of lading's use of the term 'package,'" and to "adopt the unit of packaging unambiguously identified in the bill of lading." *Seguros Illimani S.A. v. M/V Popi P*, 929 F.2d 89, 94 (2d Cir. 1991) (citing *Allied Int'l Am. Eagle Trading Corp. v. S.S. Yang Ming*, 672 F.2d

1055, 1061 (2d Cir. 1982); *Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam*, 759 F.2d 1006, 1015-16 (2d Cir. 1985)).  The parties' agreement in a bill of lading that an item is a "package" is evidence of whether it is a "package" for COGSA purposes.  *See Seguros*, 929 F.2d at 94 (2d Cir. 1991) ("'Package' is a term of art in the ocean shipping business, and parties to bills of lading should expect to be held to the number that appears under a column whose heading so unmistakably refers to the number of packages."); *Groupe Chegaravy v. P&O Contrainers*, 251 F. 3d 1359, 1368 (11th Cir. 2001) ("the court should look to the parties' contractual agreement in the bill of lading"); *Fishman & Tobin, Inc. v. Tropical Shipping & Construction* Co., 240 F. 3d 956, 960 (11th Cir. 2001) (same);  *Rainly Equipos de Riego S.R.L. v. Pentagon Freight Services, Inc.*, 979 F. Supp. 1079, 1084 (S.D. Tex. 1997) ("The number of packages as listed on the bill of lading is proof of the number of packages for COGSA purposes.").

    The bill of lading in this case indicates on each of the first three pages that the carrier received "**45** (FORTY -FIVE) PACKAGES."  (Docket Entry No. 42, Ex. 7 (emphasis in original)).  It states elsewhere on the first page that the "No. OF PKGS" is "45."  (*Id.*).  The Expert Crating packing list includes 45 items, number 27 of which is the SCR House.  (*Id.*, Ex. 2).  Photographs in the record show that the plywood surrounding the SCR House was marked "pkg 27" and "PKG NO. 27." (Docket Entry No. 52, Ex. 6).  Finally, handwriting on the Pentagon Freight Services, Inc. Delivery Instructions refers to "SCR HOUSE PKG 27."  (Docket Entry No. 42, Ex. 1).  The description of the SCR House as a "package" is consistent with the reference to "packages" as the "unit of packaging unambiguously identified in the bill of lading."  *See Seguros*, 929 F.2d at 94 (2d Cir. 1991).

Treating the SCR House as a "package" is also consistent with the relevant Fifth Circuit cases.  In *Allstate*, 646 F.2d at 170, 172-73, the Fifth Circuit found that the "packages" were small cartons containing either one stereo receiver or six clock radios, not the 20-foot marine shipping container in which they were placed.  The court quoted favorably from a Second Circuit opinion stating that "at least when what would ordinarily be considered packages are shipped in a container supplied by the carrier and the number of such units is disclosed in the shipping documents, each of those units and not the container constitutes the 'package' referred to in [COGSA]."  *Id.* at 172 (quoting *Mitsui & Co. v. American Export Lines, Inc.*, 636 F.2d 807, 817 (2d Cir. 1981)).  The Fifth Circuit concluded in *Allstate* that each carton was a package, citing in support "the shipper first having placed the goods in packages (cartons in this case) as used in the ordinary sense of the word and then having loaded those packages in a container owned or furnished by the carrier, and the number of packages within the container having been disclosed to the carrier in the bill of lading or otherwise."  *Id.* at 172-73.  In *Croft & Scully*, 664 F.2d at 1278-81, a dispute involving cardboard cases of canned soft drinks dropped from a stevedore's forklift, the Fifth Circuit relied on *Allstate* in finding that the cardboard cases, rather than the shipping container, were the "packages."  The court "found nothing in the Bill of Lading to indicate that the contracting parties intended some special meaning of the term 'package' and that "Croft & Scully had included information about the contents of the container and their number."  *Id.* at 1281; *see also In re M.V. Floreana*, 65 F.Supp.2d 489, 493 (S.D. Tex. 1999) ("When a bill of lading discloses the number of separate packages within a container, then the number of packages is the contents, not the container.").  Accordingly, it found no basis on which to distinguish *Allstate*.  *Croft & Scully*, 664 F.2d at 1281.

In the present case, the bill of lading describes the cargo as a "drilling rig and accessories." The bill of lading refers to "45 packages" on the first three pages and to a liability limit of $500 "per package" on page four.   (Docket Entry No. 52, Ex. 5).  The SCR House was the twenty-seventh of the 45 entries on the packing list and physically labeled as Package 27.  The undisputed evidence shows that as a matter of law, the SCR House is a package under COGSA.

This case is clearly distinguishable from *Tamini v. M/V Jewon*, 699 F. Supp. 105 (S.D. Tex. 1988), *aff'd sub nom. Tamini v. Salen Dry Cargo AB*, 866 F.2d 741 (5th Cir. 1989), cited by Dewanchand.  In that case, the court held that a drill rig damaged aboard a ship was not a "package" and the Fifth Circuit affirmed.  The drill rig was completely exposed with the exception of "two small areas covered by wood casing."  The rig was "not attached to a skid and no packaging preparations were attached to facilitate handling or delivery."  699 F. Supp. at 107.  The district court  found that "[a] review of the relevant shipping documents clearly indicates that none of the parties intended to treat the drill rig as a package.  The drill rig was differentiated from the eleven boxes of additional cargo in the relevant shipping documents."  *Id.* at 107-08.  In affirming, the Fifth Circuit reasoned "the cargo was not enclosed in a container; the rig was for the most part fully exposed; no appurtenances or packaging were attached to facilitate its handling during transportation; and transportation charges for the drilling rig were calculated on a weight, not per package, basis."  *Tamini*, 866 F.2d at 742.  In light of this contrary evidence, that the shipping documents placed a "1" in the column marked "No. of Pkgs." in the row corresponding to the drill rig, was not determinative.  The Fifth Circuit suggested that, because the drill rig was partially packaged, the case could have come out either way, but declined to remand for a "pointless" bench

trial, in which the same judge would consider the same evidence for a second time and reach the same result. *Id.*

The undisputed facts of this case are far different than in *Tamini*. In this case, the cargo was prepared to facilitate handling; the SCR House was attached to a skid. The SCR House was far from exposed; much of it was covered in plywood and foam insulation was added around the framing on the bottom. There is no requirement that the SCR House be *fully* enclosed to qualify as a "package." And unlike *Tamini*, the shipping documents in this case are fully consistent with the conclusion that the parties intended to treat the SCR House as a "package."

There is no reason to decide the appropriate "customary freight unit" if the goods were shipped as a "package." Evidence of how the shipping charges were calculated is only relevant as secondary evidence of the parties' intent. The shipping rates in this case were apparently calculated by weight. In light of the other factors in this case, particularly the physical packaging around the SCR House and the evidence of intent to consider the SCR House a package in the shipping documents, the use of this basis for calculating the shipping charges is not persuasive evidence of intent. The packing list reveals that the weight varied dramatically from package to package, from as low as less than 2,000 pounds to as high as 115,000 pounds. The size of each package varied from as low as just over 100 cubic feet to as high as 7,700 cubic feet. The use of weight does not undermine the conclusion that the SCR House was a "package."[3]

---

[3] *Aggreko, Inc. v. LEP Int'l*, 780 F. Supp. 429 (S.D. Tex. 1991), is also distinguishable. In that case, finding *Tamini* controlling, the court held that a large diesel generator contained in its permanent metal housing was not a "package." Although there was a frame on the bottom of the housing to assist with loading, the generator housing was not concealed or enclosed on any other side. And the bill of lading described the generator separately as a "40-foot flat rack said to contain one piece diesel generating set." *Id.* at 430-31. In this case, *Tamini* is not controlling. Plywood enclosed the SCR House and the bill of lading described it as one among 45 "packages." In addition to the factual distinctions between this case and *Aggreko*, it should also be noted that that case was based on an overstatement of the law. It cited the appellate opinion in *Tamini*,

Based on the preparations to ship the SCR House and on the bill of lading and other shipping documents, the SCR House was a "package."

## IV. Conclusion

Ports America's motion for partial summary judgment is granted in part and denied in part.

SIGNED on February 24, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

.

---

866 F.2d at 742-43, and a pre-*Allstate* Fifth Circuit case, *Magnum Marine v. Kenosha Auto Transport Corp.*, 481 F.2d 933 (5th Cir. 1973), for the proposition that "[l]arger items, like drilling rigs [as in *Tamini*] and pleasure boats [as in *Magnum Marine*] are not packages under COGSA." This broad rule was clearly not the holding of *Tamini*, which considered whether the drill rig had been covered or prepared for shipping as well as whether the shipping documents indicated an intent to consider the drill rig a "package." *Magnum Marine*, for its part, did not analyze the "package," issue at all. It determined (without stating why) that the liability limit argument was "frivolous" and rejected it "summarily." *Magnum Marine*, 481 F.2d at 934.